NICKELL, JUDGE:
Following an eight-day jury trial, the Fayette Circuit Court entered a judgment against United Parcel Service, Inc. ("UPS") and James Michael Mattingly awarding damages and attorney fees to William Barber, Jeffery Goree, Curtis Weathers, Glenn Jackson, Lamont Brown, Donald Ragland, John Hughes and David Young on claims of racial discrimination, racially hostile work environment and retaliation. Following denial of several post-judgment motions, UPS and Mattingly appealed. After a careful review of the record, the briefs and the law, we affirm.
Barber, Goree, Weathers, Jackson, Brown, Ragland, Hughes and Young are current and former UPS employees. All are African-American. These eight men worked as "feeder drivers," operating tractor-trailers between various UPS hub operations. Between 2006 and 2012, these drivers made multiple complaints to UPS management about ongoing racial hostilities at the Lexington hub. Meetings on *306 these grievances were conducted in 2009, 2011 and 2012. The issues raised included the use of racial slurs, epithets and cartoons, and the meting out of severe or unwarranted discipline based on race. Multiple specific examples of hostility and harassment were discussed. Almost immediately after having voiced their concerns during the 2009 meeting-which was attended by numerous black drivers; a union steward; the hub operations manager, Margie Speaks; and UPS district human resources manager, Frank Barber-Ragland and Jackson received multi-day "ride-alongs"[2] on orders of the feeder driver manager. UPS took no visible action to address the concerns raised during the meeting.
Racial issues continued to worsen after Mattingly became the feeder driver manager in 2009. Beginning in early 2011, Barber solicited the assistance of a union steward to schedule a meeting between Mattingly and the drivers to discuss tensions. Mattingly rebuffed the request. Shortly after being asked a second time to meet with the drivers, Mattingly fired Barber for improperly wearing his seatbelt while driving in a UPS parking lot in West Virginia. Mattingly characterized the incident as "dishonesty"-a terminable offense-rather than a safety violation. Near this same time, a white driver cited by police for not wearing a seatbelt at all received a warning from Mattingly for a safety violation. Barber's termination was subsequently reduced to a one-day suspension without pay.
Ragland and Weathers were terminated by Mattingly for "stealing time" when they were found to be noncompliant with UPS policy regarding recording on their timesheets when stops were made during trips. Ragland failed to report stops for using the restroom and Weathers did not note a stop to purchase a newspaper. Mattingly equated their behavior with a white driver who had been found sleeping in his truck on the side of the road multiple times over a period of several weeks. Ragland and Weathers were ultimately reinstated to their prior positions.
Because Mattingly continued to refuse to meet with drivers to hear their concerns or even acknowledge issues existed, Barber contacted Jim Lewis, the Ohio Valley human resources manager to set up a meeting for late summer 2011. When Mattingly learned of the meeting, he became angry, making reference to Lewis being a black man. After the meeting-which he did not attend-Mattingly contacted Speaks demanding to know when he was going to be told of the meeting. During the meeting, Lewis was told of the drivers' concerns, many of which were the same or similar to those raised in 2009. Lewis told the attendees they should not dwell on the past but should move on. He stated he would investigate the complaints, but ultimately did not speak with Mattingly or his supervisor, Speaks. Improvements in conditions were not forthcoming.
In April 2012, Barber asked Lewis to convene another meeting. Lewis insisted white drivers be permitted to attend the session. UPS was represented at the meeting by Lewis and two other human resources officials. Complaints were lodged against Mattingly by both white and black drivers. Allegations of racial hostilities and unfair treatment were reiterated. Lewis took no action as a result of the meeting, merely suggesting more discussion of the issues should occur in the future.
*307 Within a short time after the 2012 meeting, a "safety demonstration" of three points of contact was installed in the time clock area of the Lexington hub by part-time Safety Supervisor David Kleckner consisting of a replica of a UPS driver strung from the ceiling and partially connected to a ladder. At some point, the demonstration was altered with the effigy allowed to hang freely by the string around its neck and a sign placed nearby reading "No hangings please." The display was permitted to remain for several days. Many who saw it were disturbed or offended by the effigy's strong resemblance to an African-American and the allusion to a lynching. An investigation by UPS ensued, but when it was determined impossible to discern who altered the demonstration, the investigation was terminated. UPS took no further action and left it to Mattingly to address the matter with the drivers. Mattingly informed the black drivers they should not be offended, and no one meant anything bad by the demonstration.
Shortly thereafter, the instant suit was commenced against UPS, Mattingly, Kleckner and Speaks alleging disparate treatment, hostile work environment, retaliation and constructive discharge. After nearly thirty months of discovery and motion practice, the matter was tried before a jury over eight days between April 4 and April 14, 2016. At the conclusion of the proof, the trial court entered a directed verdict on all claims against Kleckner; the remaining claims were submitted to the jury. Following deliberations, the jury returned verdicts finding UPS liable for racial discrimination against Barber, a racially hostile work environment as to all plaintiffs, and retaliation against Jackson and Ragland. Mattingly was found liable for retaliation against Barber. All other claims were decided in favor of the defendants. The jury awarded varying amounts to each defendant, ranging from $100,000 to just over $1.5 million. In total, the jury awarded damages of $5,310,314.96; on post-trial motion, the trial court awarded an additional $487,195.75 in costs and attorney fees. Post-judgment motions for judgment notwithstanding the verdict ("JNOV"), a new trial and remittitur of damages were denied. This appeal followed.
UPS and Mattingly present a multi-faceted attack in seeking relief from the trial court's judgment. First, they contend all judgments must be reversed due to a lack of proof on essential elements on each claim. Next, they argue the jury's award was excessive. Third, they allege the trial court committed evidentiary and instructional errors requiring a new trial. We disagree with all these assertions.
UPS and Mattingly first argue the plaintiffs failed to prove essential elements of each of the claims raised in their complaint. UPS claims Barber failed to provide evidence of disparate treatment or an adverse employment action in support of his claim for racial discrimination. Alternatively, it posits Barber's claim was released in the settlement of a grievance he previously filed.
On the retaliation claims, Mattingly argues "it was impossible" for him to retaliate against Barber and cites a lack of evidence to the contrary. UPS contends Ragland and Jackson provided no proof of adverse employment action or that they engaged in any protected activity causally related to any alleged adverse employment action.
UPS alleges the hostile work environment judgments were unsupported by proof the alleged improper conduct was severe and pervasive as a matter of law. Alternatively, UPS argues it exercised reasonable care to prevent and correct harassment by adopting reporting and investigative *308 programs, the plaintiffs failed to utilize those services, and therefore, it cannot be held liable for any incidents not properly reported to it. Based on these alleged failures, UPS and Mattingly contend directed verdicts or a JNOV should have been granted, and therefore, the case should not have gone to the jury. They believe the judgment must be reversed. We disagree.
In ruling on a motion for directed verdict, the trial court takes as true all evidence favoring the plaintiffs and all reasonable inferences which can be drawn from such evidence. It is not at liberty to determine the weight or credibility to be given to the evidence, that function being reserved for the finder of fact. Cochran v. Downing , 247 S.W.2d 228, 229-30 (Ky. 1952). Granting the motion is warranted only if the court determines the verdict would be "palpably or flagrantly against the evidence so as to indicate it was reached as a result of passion or prejudice." National Collegiate Athletic Ass'n By and Through Bellarmine College v. Hornung , 754 S.W.2d 855, 860 (Ky. 1988) (internal quotation marks omitted). Otherwise, the matter should be submitted to the jury. Id . In Bierman v. Klapheke , 967 S.W.2d 16, 18-19 (Ky. 1998), the Supreme Court of Kentucky noted:
[i]n reviewing the sufficiency of evidence, the appellate court must respect the opinion of the trial judge who heard the evidence. A reviewing court is rarely in as good a position as the trial judge who presided over the initial trial to decide whether a jury can properly consider the evidence presented. Generally, a trial judge cannot enter a directed verdict unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ.
Over the course of the eight-day trial, conflicting and contradictory evidence was presented on each of the claims raised by the plaintiffs, thus creating factual issues "peculiarly within the province of the jury to decide." Cochran , 247 S.W.2d at 229. Our review of the record reveals from the evidence adduced, jurors could have found any or all of the defendants acted improperly and were liable for the claims raised by the feeder drivers, or it could have found the feeder drivers were each responsible for their own actions and suffered no adverse impact due to any action of the defendants, or it could have found the claims were barred by waiver-in Barber's case-or principles of estoppel due to UPS's implementation of a zero-tolerance policy for harassment and programs associated with eliminating such activities from the organization.
The trial court carefully undertook its gatekeeping role in reviewing the evidence to determine whether the feeder drivers had produced sufficient evidence to warrant submitting their claims to the jury. It found insufficient evidence existed to send any claims against Kleckner to the jury but concluded sufficient issues of fact existed to permit submission of the remaining claims. Under the circumstances, we believe the trial court correctly submitted the case to the jury. Further, based on a careful review of the voluminous record, we conclude the jury's verdict was based on sufficient evidence and was not "reached as a result of passion or prejudice." Hornung , 754 S.W.2d at 860. Although we may have reached a different finding on these facts, we are unauthorized to overturn the decision of the jury. Cochran , 247 S.W.2d at 230.
UPS and Mattingly next argue the jury's award of damages was excessive and must be vacated. Claiming the damage award bears no relationship to the facts *309 and evidence presented at trial, UPS and Mattingly contend the jury made their decision under the influence of passion or prejudice, or otherwise wholly disregarded the evidence. They imply emotional distress damages must be related to lost wages, lost benefits or medical or counseling expenses. They offer no legal support for their position. UPS and Barber believe the trial court should have granted their motion for a new trial and urge this Court to grant the same relief. We decline the invitation.
[I]t is clear that compensatory damages, including humiliation and emotional distress, are allowable under KRS 3 344.450. As such the standard of review in this situation is simply whether the trial court abused its discretion by not granting a new trial on the ground that the award of damages was excessive. Hazelwood v. Beauchamp , 766 S.W.2d 439, 440 (Ky. App. 1989). The standard for determining whether the circuit court abused its discretion by not granting a new trial on the ground that the award of damages was excessive is as follows:
The amount of damages is a dispute left to the sound discretion of the jury, and its determination should not be set aside merely because we would have reached a different conclusion. If the verdict bears any relationship to the evidence of loss suffered, it is the duty of the trial court and this court not to disturb the jury's assignment of damages.
Id. (footnote added) (citations omitted).
Childers Oil Co., Inc. v. Adkins , 256 S.W.3d 19, 28 (Ky. 2008).
UPS correctly asserts the only evidence related to emotional distress or humiliation came from the testimony of the feeder drivers themselves, and such testimony was mostly subjective. "However, unless the verdict bears no relationship to the evidence, it should not be set aside. The assessment of damages is a matter left in the hands of the jury, and their decision should be disturbed only in the most egregious circumstances." Id. The plaintiffs' evidence revealed UPS permitted a hostile work environment to persist for many years, evinced an attitude of acceptance of racial harassment and retaliation, was indifferent and uninterested in conducting meaningful investigations or taking appropriate remedial actions, and otherwise permitted the perpetuation of an environment of fear and hostility. Of course, UPS strongly disputes any such inferences. Nevertheless, there was enough evidence to support the jury's findings of emotional distress, and the awards are not so disproportionate to the evidence to warrant the verdict being set aside or a new trial being granted. The argument to the contrary is without merit.
Finally, UPS and Mattingly contend the trial court committed evidentiary and instructional errors warranting reversal. They believe the instructions related to discrimination, hostile work environment and racial discrimination each omitted essential elements of proof or law required to support the verdict. They argue the errors were compounded by the trial court admitting into evidence testimony regarding events occurring outside the applicable limitations period. Again, we disagree.
Jury instructions are intended to guide the jury "in applying the law correctly to the facts in evidence." CSX Transportation, Inc. v. Begley , 313 S.W.3d 52, 60 (Ky. 2010). Any alleged errors in jury instructions are considered questions of law and are reviewed by this Court de *310 novo. Hamilton v. CSX Transportation, Inc. , 208 S.W.3d 272, 275 (Ky. App. 2006).
"Instructions must be based upon the evidence and they must properly and intelligibly state the law." Howard v. Commonwealth , 618 S.W.2d 177, 178 (Ky. 1981). "The purpose of an instruction is to furnish guidance to the jury in their deliberations and to aid them in arriving at a correct verdict. If the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury." Ballback's Adm'r v. Boland-Maloney Lumber Co. , 306 Ky. 647, 652-53, 208 S.W.2d 940, 943 (1948).
Id.
"Bare bones" instructions are proper if they correctly advise the jury about what it must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof on that issue. The question to be considered on an appeal of an allegedly erroneous instruction is whether the instruction misstated the law. It is within a trial court's discretion to deny a requested instruction, and its decision will not be reversed absent an abuse of that discretion.
Olfice, Inc. v. Wilkey , 173 S.W.3d 226, 229 (Ky. 2005) (internal citations and quotation marks omitted). Abuse of discretion occurs when the trial court's ruling is arbitrary, unreasonable, unfair or unsupported by sound legal principles. Commonwealth v. English , 993 S.W.2d 941, 945 (Ky. 1999). Mere doubt as to the correctness of a trial court's finding will not justify reversal. Moore v. Asente , 110 S.W.3d 336, 354 (Ky. 2003).
Of course, "it is a rule of longstanding and frequent repetition that erroneous instructions to the jury are presumed to be prejudicial." We recently affirmed our intention to "return and adhere to the presumption of prejudice inherent in an erroneous instruction." This presumption is rebuttable, but the party asserting the error is harmless bears the burden of affirmatively showing that no prejudice resulted from the error. In order to show no prejudice resulted from the error, it must be proven there was "no reasonable possibility" the erroneous jury instruction affected the verdict.
Osborne v. Keeney , 399 S.W.3d 1, 13 (Ky. 2012) (internal footnotes and citations omitted).
We have reviewed the instructions with an eye toward the alleged errors and conclude they fairly and adequately stated the law and properly required the jury to determine the facts necessary to return its verdict. While UPS and Mattingly proffered instructions requiring the jury to make additional legal and factual findings, we discern no abuse of discretion in the trial court's refusal to give those instructions. Contrary to UPS and Mattingly's assertions, the trial court did not misstate the law in instructing the jury and the instructions were clearly not calculated to mislead the jury. Further, in light of the evidence adduced at trial and the jury's decisions concerning liability of the various defendants, it is clear no prejudice befell UPS or Mattingly due to the trial court's failure to utilize their tendered instructions as there is "no reasonable possibility" the alleged error affected the outcome.
We must briefly comment on UPS and Mattingly's challenge to the trial court's determinations as to the admissibility of evidence. We review a trial court's decision to admit or exclude evidence under the abuse of discretion standard. Goodyear Tire and Rubber Co. v. Thompson , 11 S.W.3d 575, 577 (Ky. 2000). The evidence complained of was introduced to *311 show incidents of racial animus were brought to UPS's attention during meetings with UPS managers in 2009, 2011 and 2012. It also tended to undermine UPS's defense that it exercised reasonable care to prevent harassment and take corrective action when necessary. Further, this evidence showed a pattern and practice of adverse treatment, racial hostility, discrimination and retaliation-a purpose approved by our Supreme Court. See Kentucky Department of Corrections v. McCullough , 123 S.W.3d 130, 135-36 (Ky. 2003). We discern no abuse of the trial court's broad discretion in the admission of the challenged testimony. No showing of undue prejudice or jury confusion has been made. There was no error.
For the foregoing reasons, the judgment of the Fayette Circuit Court is AFFIRMED.
ALL CONCUR.

A "ride-along" is an event where a driver is accompanied by a supervisor to critique the driver's performance. Testimony was adduced at trial revealing such events were generally punitive in nature. No other driver had ever received such a lengthy ride-along.