UNITED STATES of America, Appellee,

v.

Joseph BURGER, Defendant-Appellant.

No. 1303, Docket 84–1093.

United States Court of Appeals,
Second Circuit.

Argued May 18, 1984.

Decided July 13, 1984.

Richard Ware Levitt, New York City (John L. Pollok, Hoffman Pollok & Gasthalter, New York City, of counsel), for defendant-appellant.

David N. Lawrence, Asst. U.S. Atty., Southern District of New York, New York City (Rudolph W. Giuliani, U.S. Atty. for the Southern District of New York, Barry A. Bohrer, Asst. U.S. Atty., Southern District of New York, New York City, of counsel), for appellee.

Before MESKILL, CARDAMONE and PRATT, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York, Carter, J., convicting appellant Joseph Burger, after a jury trial, of one count of possessing and concealing counterfeit fifty dollar bills in violation of 18 U.S.C. § 472 (1982). Burger was convicted on the last count of a four count superseding indictment. Count One charged Burger, Carmine Agnello and Dominick Marino with conspiring to pass and utter counterfeit fifty dollar bills in violation of 18 U.S.C. § 371 (1982). Counts Two and Three charged Agnello and Marino, respectively, with passing and uttering counterfeit fifty dollar bills in violation of 18 U.S.C. § 472. The only conviction resulting from the joint trial was that of Burger on Count Four. He was sentenced to four months imprisonment and a three year probation term. As a special condition of probation, Burger was ordered to pay $1,000 restitution to Yonkers Raceway. Burger is presently free on bail pending the outcome of this appeal.

We vacate the judgment and remand for further proceedings consistent with this opinion.

## BACKGROUND

Pursuant to an arrest warrant, Burger was arrested by Secret Service agents on September 7, 1983, at approximately 5:30 p.m., in connection with the receipt by Yonkers Raceway on September 2, 1983 of twenty-one counterfeit fifty dollar bills. He was apprehended while riding in a car with his employer and co-defendant, Agnel-

lo and Agnello's cousin, Frank Spears. The three men were taken in separate cars to the Secret Service field office at the World Trade Center; only Burger and Agnello were arrested.

Secret Service agents began questioning Burger at approximately 7:30 p.m. At about 10:00 p.m. he signed a statement that he purchased $1,200 in counterfeit money from a friend named "Cue Ball" and that he took the bogus money to Yonkers Raceway on September 2. What happened during the interval between Burger's arrest and his confession is in dispute. At the hearing on the motion to suppress his statement, Burger maintained that immediately following his arrest he was taken to Fresh Meadow Park in Queens where he was kicked, choked and beaten in broad daylight by the two arresting agents. He claimed that two other agents arrived in a black Cadillac and joined the altercation and that one of them challenged him to a fight. He stated that he told the agents repeatedly that he did not want to speak to them until he consulted his attorney but his protests were ignored.

Burger also maintained that his abusive treatment continued after he arrived at the Secret Service office. He stated that he was not read his rights and that the officers continued to question him despite his demand to see a lawyer. He claimed that the officers threatened to harass his grandmother. He asserted that four officers took turns beating him until he signed a confession, which he did only to end the ordeal.

Burger's account was supported by Spears, who testified at the suppression hearing that the room in which he was placed at the Secret Service office was adjacent to the one in which Burger was held. Spears stated that he could hear screams emanating from the next room. He testified that while left alone, he accidently turned off the light in the room and was able to see Burger, who was handcuffed to a bar on the wall, being questioned and punched in the abdomen by several agents. He stated that he was able to name Jan Gilhooly as one of the agents beating Burger because Gilhooly subsequently gave him a card and printed his name thereon. However, Spears was unable to describe Gilhooly's appearance or identify him at the hearing and Gilhooly's handwritten name on the card was misspelled.

At the suppression hearing, the government presented an entirely different account of the facts following Burger's arrest. Agent Ogilvie, one of the arresting officers, testified that he promptly advised Burger of his rights and that Burger indicated that he wanted to talk without the presence of an attorney. Agent Ogilvie stated that neither he nor Agent Saez, the other arresting officer, struck, kicked or threatened Burger at any time. He testified that they drove directly from the point of arrest to the Secret Service office and that they did not stop at Fresh Meadow Park.

Agent Lynch testified that he and Agent Sira interviewed Burger after he arrived at the Secret Service office. He stated that Agent Sira informed Burger of his rights and that he waived them voluntarily. He stated that Burger's oral statements were reduced to writing and that Burger read and signed the written statement. He said that Burger never complained of mistreatment by the arresting agents and that he showed no visible signs of abuse. Agent Lynch testified that he was with Burger continuously after his arrival at the office with the exception of several very brief intervals and that no other agents ever entered the interview room. He testified that Burger was not threatened or choked. He confirmed that the interview room contained a one-way mirror which would not yield a view into the next room unless the viewing room was darkened, but he stated that he believed that the light was on continuously in the next room.

Agent Gilhooly testified that he did not participate in Burger's interview and that he did not threaten, beat, kick or choke Burger. Furthermore, Agent Gilhooly stated that he did not sign a card or give one to any individual that evening.

Judge Carter heard testimony that after the questioning concluded and Burger signed the statement, Lynch and three other agents drove to Queens in an attempt to locate "Cue Ball." Their efforts were unsuccessful. Burger was taken to the Metropolitan Correctional Center (MCC) in New York for lodging overnight pending arraignment the following day. The government introduced the testimony of George May, Administrative Assistant to the Manager of the MCC, who stated that Burger indicated on his intake form that his medical condition was "good." May testified that Burger bore no signs of physical abuse and photographs taken at the time of admission showed no evidence of abusive treatment. May stated that Burger voiced no complaints the next day about being turned over to the custody of Agent Gilhooly.

The district court denied Burger's motion to suppress his confession on January 25, 1984 and trial commenced shortly thereafter. The evidence against Burger at trial consisted mainly of his confession and the discovery of several shredded counterfeit bills outside the Raceway, one of which bore Burger's fingerprint. The district court initially refused at trial to allow Burger to present any evidence concerning the voluntariness of his statement. On cross-examination of Agent Lynch, Burger's counsel limited his inquiries to why Burger's statement had been written by Agent Sira rather than tape-recorded in its entirety. Neither Agent Sira nor Agent Ogilvie was cross-examined on the issue of the voluntariness of the confession. After the government rested, Burger's counsel informed the court that he would have called both Burger and Spears to testify as to voluntariness had the court's ruling not precluded evidence on the question. The defense then rested without calling any witnesses.

Following the luncheon recess, and before closing arguments commenced, the court informed counsel that it had discovered that its decision not to allow at trial the introduction of evidence on the voluntariness of the statement was erroneous. The court offered to reopen the case and to give Burger the opportunity to examine witnesses. Burger's counsel refused the offer and moved for a mistrial. The motion was denied. Burger was subsequently found guilty of violating 18 U.S.C. § 472.

## DISCUSSION

Burger initially argues that the district court erred in denying his suppression motion on the grounds that the confession was involuntary and taken without a valid waiver of his *Miranda* rights. The district court stated in its decision that "the Court has to operate on a presumption that public officials will perform their duties in good faith and according to law. That presumption is rebuttable...." The court did not discuss the strength of the government's evidence but rather analyzed the weaknesses in Burger's presentation; it commenced its analysis by stating that "[t]here were gaps in [Burger's] story that leave doubt." The court, while acknowledging that Spears was in the room next to Burger's, discredited Spears' account of the beating. The court did not believe that Spears had obtained the name of one of Burger's assailants because Spears could not identify Agent Gilhooly despite his distinctive appearance and because Gilhooly's name was misspelled on the card. The court went on to address Burger's testimony and concluded that it left "great doubt." The court found it unlikely that the agents would have taken Burger to a public park if they intended to assault him since it would have been easier to do so in private. The court discounted Burger's testimony because he could not identify any of the agents who allegedly had administered the beatings. The court also expressed skepticism because Burger listed his physical condition as "good" upon arrival at the MCC and because photographs taken there showed no evidence of physical abuse. The court concluded that the "gaps in the testimony leave the allegation of beating unproved, and under those circumstances the motion is denied."

■ From the statements of the district court made at the suppression hearing, it appears that the court improperly placed the burden of proving involuntariness and the lack of a valid waiver on the defendant. We find this troubling. In *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), the Supreme Court held that the prosecution bears the burden of establishing the admissibility of a confession by at least a preponderance of the evidence. *Id.* at 486, 92 S.Ct. at 625. *See Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.") (citation omitted); *United States v. Hackley*, 636 F.2d 493, 500 (D.C.Cir.1980) (waiver of the right to remain silent must be established by a preponderance of the evidence); *United States v. Glover*, 596 F.2d 857, 865 (9th Cir.) (same), *cert. denied*, 444 U.S. 857, 860, 100 S.Ct. 117, 62 L.Ed.2d 76 (1979). The defendant is entitled to a determination of the admissibility of his statement under the proper legal standard. *See Hill v. Beto*, 412 F.2d 831, 832 (5th Cir.1969) (per curiam).

■ The government maintains that the district court's findings of fact were not clearly erroneous and that it implicitly found that the government had met its burden of proof. We disagree. It is not at all clear to us that the district court utilized the proper standard. The district court, according to its own statement, presumed that the agents acted lawfully. It did not discuss the strength of the government's case. The court apparently required Burger to overcome the presumption of lawful conduct. The court may have meant that the government's evidence satisfied its burden of production and that Burger's evidence to the contrary was not persuasive. But rather than speculate about what the district court meant by what it said, we must remand for further proceedings to ensure the protection of the rights implicated by the decision not to suppress Burger's confession. *See United States v. Medina*, 552 F.2d 181, 186 (7th Cir.) ("it would have been the better practice for the trial judge to state that it found the statements to be voluntary by a preponderance of evidence and to give reasons for so concluding"), *cert. denied*, 434 U.S. 839, 98 S.Ct. 132, 54 L.Ed.2d 102 (1977); *United States v. Gardner*, 516 F.2d 334, 341 (7th Cir.), *cert. denied*, 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975); *United States v. Chapman*, 448 F.2d 1381, 1387 n. 8 (3d Cir.1971) (preferable course is for district court to state specifically whether there was a voluntary waiver of rights), *cert. denied*, 405 U.S. 929, 92 S.Ct. 982, 30 L.Ed.2d 803 (1972). On remand, if the district court finds that the confession was admissible under the appropriate standard of proof, it may reinstate the judgment of conviction. If, however, the court determines that the confession was inadmissible, it must suppress it and order a new trial.

Burger's second point is that the district court erred by denying his motion for a mistrial. He maintains that the district court's offer to reopen the case to allow him to pursue the voluntariness issue before the jury was inadequate because he was already "irretrievably" committed to a strategy incompatible with involuntariness. He posits that at trial he was forced to attack the existence of the confession rather than its voluntariness because of the court's initial ruling. He claims that he could not later pursue the voluntariness issue without conceding the existence of the statement. Additionally, he maintains that the belated admission of evidence on voluntariness could not have had the same impact on the jury as if it had been admitted in a timely manner and that the jury would have been left to speculate on the reasons why the testimony had not been introduced earlier. We find none of these arguments to be persuasive.

■ The district court is vested with discretion to reopen a case after the de-

.fense has rested. *United States v. Kanovsky*, 618 F.2d 229, 231 (2d Cir.1980); *United States v. Aiken*, 373 F.2d 294, 300 (2d Cir.), *cert. denied*, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967). A trial court should correct errors made in the course of trial while it still has the opportunity to do so unless the errors are so serious or prejudicial that they cannot be effectively cured. *Compare United States v. Strand*, 574 F.2d 993, 996 (9th Cir.1978) (erroneous exclusion of defendant's exculpatory statements rendered harmless by later admission of statements) *and Deschenes v. United States*, 224 F.2d 688, 692 (10th Cir.1955) (improper exclusion of defendants' testimony on intent cured by subsequent admission under corrected ruling) *with Throckmorton v. Holt*, 180 U.S. 552, 567, 21 S.Ct. 474, 480, 45 L.Ed. 663 (1901) ("The general rule is that if evidence which may have been taken in the course of a trial, be withdrawn from the consideration of the jury by the direction of the presiding judge, that such direction cures any error which may have been committed by its introduction. But yet there may be instances where such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission . . . .") (citations omitted). We conclude that the district court's offer to reopen the case was sufficient to render harmless its previous error in excluding evidence challenging the voluntariness of Burger's confession and that the belated introduction of this testimony would not have been unfairly prejudicial.

█ Burger's argument that his prior strategy was incompatible with a belated attack on voluntariness has a hollow ring. Contrary to his assertions, at trial Burger did not dispute the existence of his confession. Rather, he questioned its accuracy and comprehensiveness. The parties stipu-

lated that Burger's written statement would not be admitted into evidence in order to avoid *Bruton* problems, *see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and that the government would offer the admissible substance of the statement through its witnesses. After Agent Lynch testified as to Burger's statement, the court told the jury that "the testimony we have heard that Mr. Burger made a written statement—Special Agent Lynch has so testified—the statement will not be introduced for legal reasons but *you may rely on the fact that a statement was made*" (emphasis added). Burger's counsel failed to object. On cross-examination of Lynch, Burger's counsel inquired whether there was recording equipment available and why it was not used. He asked why Agent Sira, rather than Burger, had written the statement. The obvious implication of these questions was that the agents edited the statement to suit their purposes and excluded any exculpatory material. Thus, the purpose of the line of questioning was to challenge the accuracy of the statement rather than its existence.[1]

Given this setting, if the case were reopened, it would not have been inconsistent for Burger to attempt to show that his statement was involuntary as well as inaccurate. The two positions are not only not inconsistent but on the facts of this case might be mutually reinforcing. *See Jackson v. Denno*, 378 U.S. 368, 385–86, 84 S.Ct. 1774, 1785–1786, 12 L.Ed.2d 908 (1964) (involuntary confessions inadmissible in part because of their probable unreliability); *Spano v. New York*, 360 U.S. 315, 320, 79 S.Ct. 1202, 1205, 3 L.Ed.2d 1265 (1959).

█ Burger claims that his belated attack on the voluntariness of his statement would lack continuity and would not have the same impact on the jury that it would

---

1. Some of counsel's remarks on summation were designed to question the existence of the statement. The impact of these remarks is tempered by the fact that they were made after the court had offered to reopen the case and coun-

sel had declined because he stated that he was irretrievably committed to an inconsistent position. Thus, counsel's statements on summation were self-serving and may have been intended to bootstrap the inconsistency argument.

have if allowed earlier. This argument has little force. The government and the defense rested just prior to the court's offer to reopen, the defense resting without presenting any evidence. Agent Lynch testified on January 26 and the offer to reopen was made on January 27. Thus, the evidence was still fresh in the minds of the jurors. The reopening of the case would give Burger an opportunity to focus the jury's attention solely on voluntariness just prior to deliberations. It is unlikely that this would work to Burger's disadvantage. Moreover, the reopening of the case would not give the jury the impression that the court had prejudged the merits of the argument. The court stated that it would explain to the jury why the issue had not been presented previously. Burger was given an opportunity to call or recall any witnesses he desired. In sum,

> [w]e cannot agree that the exclusion of competent testimony leaves in the minds of the jury such a lingering doubt concerning its worth as to impair its probative value when subsequently admitted in the course of the trial under the corrected ruling of the court. To indulge in this presumption would deny the indisputable power of the court to correct its ruling on admissibility of evidence.

*Deschenes v. United States,* 224 F.2d at 692.

Burger's third point, with which we agree, is that the district court improperly ordered him to make $1,000 restitution to Yonkers Raceway as a condition of probation. The statute upon which the order was based, 18 U.S.C. § 3651 (1982), states that, as a condition of probation, a defendant "[m]ay be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had." We have stated that an order of restitution is permissible " 'only for actual damages flowing from the specific crime charged in the indictment of which the defendant is convicted.' " *United States v. Elkin,* 731 F.2d 1005, 1013 (2d Cir.1984) (quoting *United States v. Tiler,* 602 F.2d 30, 33 (2d Cir. 1979)). *Cf. People v. Heil,* 79 Mich.App.

739, 749, 262 N.W.2d 895 (1977) (restitution proper for losses "which are a direct result of the defendant's criminal acts"); *State v. Barnett,* 110 Vt. 221, 231–32, 3 A.2d 521 (1939) ("restitution must be for loss sustained as a direct consequence of the commission of the particular crime of which the [defendant] stands convicted").

Burger was convicted of possessing and concealing counterfeit money. It is difficult to see how the possession and concealment of the bogus bills caused the loss incurred by Yonkers Raceway. The statute provides for the reparation of losses suffered by the victim of a criminal act. *United States v. Jimenez,* 600 F.2d 1172, 1174 (5th Cir.), *cert. denied,* 444 U.S. 903, 100 S.Ct. 216, 62 L.Ed.2d 140 (1979). The criminal act which resulted in a loss to the Raceway was the passing of the counterfeit bills, *see* 18 U.S.C. § 472; the mere possession and concealment of the bogus money by itself did not harm the Raceway. Therefore, Burger's offense did not "cause" the loss for which he now is required to make restitution.

The government argues that the "flowing from" language in *Elkin* and *Tiler* creates a "but for" or "cause in fact" test; *i.e.,* but for Burger's presence at Yonkers Raceway on September 2 with counterfeit money in his possession, the Raceway would not have incurred a loss by accepting wagers made with the counterfeit bills. We do not read *Elkin* or *Tiler* to have created any such test. The "flowing from" language in both cases is constrained by the requirement of the statute that restitution be limited to "actual damages or loss *caused by* the offense for which conviction was had." 18 U.S.C. § 3651 (emphasis added).

The judgment of conviction is vacated and the case is remanded for further proceedings consistent with this opinion.