RENDERED: JULY 15, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0476-MR

KATHERINE M. WALDRIDGE                            APPELLANT

               APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE OLU A. STEVENS, JUDGE
           ACTION NOS. 17-CR-001187-001 AND 18-CR-001400-001

COMMONWEALTH OF KENTUCKY                      APPELLEE

AND

NO. 2020-CA-0477-MR

THEODORE ANTHONY
WALDRIDGE                                         APPELLANT

               APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE OLU A. STEVENS, JUDGE
           ACTION NOS. 17-CR-001187-002 AND 18-CR-001400-002

COMMONWEALTH OF KENTUCKY                      APPELLEE

AND

NO. 2020-CA-1592-MR

KATHERINE M. WALDRIDGE                                          APPELLANT


APPEAL FROM JEFFERSON CIRCUIT COURT
v.              HONORABLE OLU A. STEVENS, JUDGE
ACTION NOS. 17-CR-001187-001 AND 18-CR-001400-001


COMMONWEALTH OF KENTUCKY                                         APPELLEE

AND


NO. 2020-CA-1601-MR

THEODORE ANTHONY                                                APPELLANT
WALDRIDGE


APPEAL FROM JEFFERSON CIRCUIT COURT
v.              HONORABLE OLU A. STEVENS, JUDGE
ACTION NOS. 17-CR-001187-002 AND 18-CR-001400-002


COMMONWEALTH OF KENTUCKY                                         APPELLEE

OPINION
AFFIRMING IN PART AND VACATING IN PART


BEFORE:  CLAYTON, CHIEF JUDGE; CETRULO AND GOODWINE,
JUDGES.

GOODWINE, JUDGE:  Katherine M. Waldridge ("Katherine") and Theodore Anthony Waldridge ("Anthony") appeal from their judgments of the Jefferson Circuit Court for theft by failure to make required disposition over $10,000.  They also appeal from the Jefferson Circuit Court's restitution order holding them jointly and severally liable for $13,000 owed to Eric Tan.  After careful review, we affirm in part and vacate in part.

## BACKGROUND

Katherine and Anthony own A-O-K Home Improvements and Contracting, LLC ("A-O-K").  Eric Tan ("Eric") and Kami Tan (collectively "the Tans") hired A-O-K to remodel a frozen yogurt shop into a Cold Stone Creamery.  The Tans expected to spend up to $110,000 and reviewed three bids in that range.  But A-O-K bid $47,370, and the Tans accepted A-O-K's bid.

On September 26, 2016, the parties executed a contract prepared by Katherine and signed by Anthony on A-O-K's behalf.  The contract between A-O-K and the Tans divided the remodel into five phases, and A-O-K was to be paid in installments at the beginning of each phase.  The payment schedule was as follows: $4,000 for permits and planning; $26,022 for Phase I demolition; $9,000 for Phase II rough-in; $5,000 for Phase III finishing; and $3,348 for Phase IV final walkthrough.  The Tans paid A-O-K $30,000, and A-O-K obtained permits and began demolition.

The contract described the work to be performed by A-O-K during each phase. Only Phase I and Phase II are pertinent to this appeal. The contract provided:

> Phase I:
> Demo will start and be completed in this phase according to plans. All trades will start demo and have ready for the rough in stage. In this phase you will expect to see old plumbing removed and/or capped off. Electrical removed including all light fixtures with the exception of bathrooms, back hallway and kitchen area and prepared for new line sets where needed. Old walls removed and marked out for new studs to be put in place ready for construction. Any and all existing materials not staying will be removed as well.
>
> Phase II:
> This is the rough in stage of the construction[.] In this phase you can expect to see all framing work done[.] Plumbing will be ready for rough-in walkthrough. Electrical will be ready for the rough-in walkthrough. Floor prep will also be done during this stage.

Record ("R.") at Defendant's Trial Exhibit 1.[1]

By early October 2016, most of the $30,000 received from the Tans was deposited in A-O-K's bank account. A-O-K obtained permits, started Phase I, and did some work on Phases II and III. Construction proceeded slowly, and the relationship between the parties became further strained when A-O-K billed the Tans $4,860 to install a grease trap required by a Louisville ordinance, but it was

---

[1] References to the record are to No. 18-CR-001400. The trial exhibits were not paginated as part of the record on appeal. Instead, they were in a manila envelope attached to the record.

not included in the Tans's blueprints. The Tans refused to pay for the grease trap, and A-O-K eventually agreed the Tans did not have to pay.

Despite Phase I being incomplete, Eric last saw Anthony on site around Thanksgiving 2016. But A-O-K requested the $9,000 allocated for Phase II on December 13, 2016. Eric refused to pay because Phase I had not been completed, and he expressed concern that A-O-K had not timely ordered floor tiles. When Anthony requested funds to order tile, Eric told him to use funds already received. Anthony responded in a text message, "You gave us 26k. The plumber and electrician is [sic] taking half of that. Plus, I've paid for labor and materials and rental and tons of gas. That's not free." R. at Commonwealth's Trial Exhibit 5. But Anthony never paid Graham, the plumber, nor Mosley, the electrician. Both informed Eric they had not been paid and threatened to walk off the job. Eric persuaded them to continue working by personally guaranteeing payment.

In late December 2016, Graham billed A-O-K $4,000 for the plumbing work he performed. Katherine and Anthony ignored his request, and Eric paid Graham the $4,000. At or about the same time, Mosley also sought payment for his $6,000 invoice. When A-O-K failed to respond, Mosley emailed A-O-K begging for payment, so he could "put this behind me and move on." R. at Commonwealth's Trial Exhibit 15. Katherine responded that no payment would

be sent until Mosley's insurer sent her a waiver of liability and a certificate of insurance. But neither was requested when Mosley was hired. A-O-K never paid Mosley, and the Tans paid $4,000 of Mosley's $6,000 invoice for the work performed while A-O-K worked on the project. Neither Katherine nor Anthony ever informed Graham or Mosley they were withholding payment because they believed they did not have to pay subcontractors until the Tans paid $9,000 for Phase II.

Eric refused to pay $9,000 for Phase II because A-O-K failed to complete Phase I. On January 5, 2017, Eric sent a letter to A-O-K notifying Katherine and Anthony they were no longer employed to finish the Cold Stone Creamery due to job abandonment and failure to pay the plumber and electrician. Katherine and Anthony assert they stopped performance for lack of payment and breach of contract. After Eric's request for a refund was ignored, he contacted the Saint Matthews Police Department.

The investigation was referred to Detective Mike Smithers of the Kentucky Attorney General's Consumer Fraud Department. Detective Smithers discovered that although most of the $30,000 paid by the Tans had been deposited into A-O-K's business account, most of it had been used to purchase personal items unassociated with renovating the Cold Stone Creamery. Katherine and

Anthony were indicted for theft by deception[2] and theft by failure to make required disposition of property over $10,000.[3] The case proceeded to a jury trial in November 2019. Katherine and Anthony were tried jointly.

At trial, Eric testified Anthony did some work on the job, but he did not complete a single task listed under Phase I of the contract. Both Graham and Mosley testified they entered into oral contracts with A-O-K. Each stated multiple times their requests for payment were ignored, and neither was paid by A-O-K. Instead both were compensated for their work after notifying Eric, who paid their invoices himself.

Detective Smithers testified about his investigation into A-O-K's bank records. On October 11, 2016, the account had a balance of $1,250.24 before the $26,000 for Phase I was deposited. Detective Smithers identified at least $17,718 in personal purchases that had been charged on the account between October 11, 2016, and December 31, 2016, including purchases from restaurants, Amazon, Kohl's, Academy Sports, Apple, and Time Warner Cable. Detective Smithers concluded these expenditures were personal rather than business related. He could not identify any charges in A-O-K's bank records for subcontractors or materials associated with renovating the Cold Stone Creamery.

---

[2] Kentucky Revised Statutes ("KRS") 514.040 (Class D felony).

[3] KRS 514.070 (Class C felony).

Katherine testified in her own defense, and described herself as the person who handled all money and paperwork for A-O-K. On cross-examination, she admitted she and Anthony made personal purchases on A-O-K's business account but attempted to portray their actions as mere commingling of personal and business expenses. But the Commonwealth asked her to go over her bank records and explain which purchases related to work on the Cold Stone Creamery. Katherine speculated purchases at gas stations and purchases from certain vendors, such as Amazon or Lowe's, were possible business expenses. But she was unable to definitively identify any charge on A-O-K's bank statements she knew for certain was a payment for labor or materials used on the Cold Stone Creamery project.

Anthony also testified in his own defense, and explained he made purchases on A-O-K's account every day. He admitted to hiring Graham, but he claimed Eric hired Mosley. Anthony testified he and Katherine finished all tasks under Phase I of the contract and many under Phase II and Phase III. He alleged they stopped working on the project after Eric refused to pay for Phase II and the grease trap. Anthony supported his testimony by introducing several photos allegedly showing the work he performed. Eric was recalled, and he testified the work shown in the photos was work performed by men he recruited from his neighborhood to finish renovations after Anthony stopped coming to the site.

After hearing all the evidence, the jury found Katherine and Anthony, either acting alone or in complicity with the other, guilty of theft by failure to make required disposition of property over $10,000. The jury acquitted them of theft by deception. They were each sentenced to five years' imprisonment, probated for five years. Katherine and Anthony each appealed their respective convictions.

After trial, the trial court set a restitution hearing. Before the hearing, new counsel replaced Katherine's trial counsel. Although neither the Commonwealth nor the defense introduced scientific or technical evidence at trial, Katherine's new counsel filed a motion under seal for $5,000 to hire a forensic accountant to aid in preparation and presentation of the defense. She requested that the motion be heard *ex parte*. The trial court denied the motion without an *ex parte* hearing. The court also entered an order allotting forty-five minutes for the restitution hearing.

At the restitution hearing, Eric explained, consistent with his trial testimony, that he paid part of Graham's and Mosley's invoices, so they would continue working on the site. Eric considered the rest of their invoices to be A-O-K's responsibility. Eric also testified that he paid Burnett Construction $5,000 to finish the demolition work A-O-K refused to complete. Thus, the Commonwealth sought $13,000 in restitution: $4,000 for the amount paid to Graham; $4,000 for the amount paid to Mosley; and $5,000 for the amount paid to Burnett

Construction for demolition. The Commonwealth's direct examination took less than ten minutes.

Katherine and Anthony cross-examined Eric for over an hour, and most of the questions were irrelevant to the restitution amount. The trial court informed Katherine the forty-five minutes set aside for the hearing had lapsed, Katherine kept questioning Eric for another five minutes, and she ended questioning after the court once again asked her to conclude cross-examination.

Next, the Commonwealth called Mosley, the electrician, about the work he performed. He explained he performed demolition and the removal of wires and fixtures and did these tasks at A-O-K's request. The Commonwealth's direct examination took less than four minutes. Katherine and Anthony cross-examined Mosley for about twenty minutes and again asked questions mostly irrelevant to the restitution issue.

Around an hour and forty minutes into the hearing, Katherine asked to call her investigator as a witness. The trial court denied her request, noting she was out of time. The court also denied her request for a continuance and instructed the parties to give closing arguments. The trial court entered a written order finding Katherine and Anthony jointly and severally liable to Eric for $13,000 in restitution.

Katherine and Anthony moved to alter, amend, or vacate. They argued the trial court erred in refusing her request to call her investigator as a witness. She alleged he would have testified about a conversation he had with Jeremy Burnett of Burnett Construction. In an attached affidavit, the investigator alleged Burnett told him he laid tile for Eric but could not recall performing demolition work at the Cold Stone Creamery. The trial court entered an order stating the motion was considered and denied. Katherine and Anthony each appealed the trial court's restitution order.

## ANALYSIS

### 1. No. 2020-CA-0476-MR – Katherine's Appeal of Her Conviction

On appeal, Katherine argues: (1) the trial court erred in denying her motion for directed verdict because, based on the terms of the contract, no crime occurred; (2) the trial court did not have jurisdiction over the case as her conduct was a civil, not criminal, issue; and (3) the trial court erred in excluding screenshots of Graham's texts to Anthony.

First, Katherine argues the trial court erred in denying her motion for directed verdict because, based on the terms of the contract, no crime occurred. In ruling on a motion for directed verdict, the trial court must:

> draw all fair and reasonable inferences from the evidence
> in favor of the Commonwealth. If the evidence is
> sufficient to induce a reasonable juror to believe beyond
> a reasonable doubt that the defendant is guilty, a directed

> verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020) (quoting *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991)). On appeal, "the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal." *Id.* (quoting *Benham*, 816 S.W.2d at 187).

Katherine and Anthony were convicted of theft by failure to make required disposition under KRS 514.070:

> (1) A person is guilty of theft by failure to make required disposition of property received when:
>
> (a) He or she obtains property upon agreement or subject to a known legal obligation to make specified payment or other disposition whether from such property or its proceeds or from his or her own property to be reserved in equivalent amount; and
>
> (b) He or she intentionally deals with the property as his or her own and fails to make the required payment or disposition.

Katherine and Anthony had a known legal obligation to pay the electrician and plumber. A-O-K was the contractor on the job and had a duty under KRS 376.070 to pay all subcontractors from funds received by the owner:

(1) Any contractor, architect or other person who builds,
repairs or improves the property of another under such
circumstances that a mechanic's or materialman's lien
may be imposed on the property shall, from the
proceeds of any payment received from the owner,
pay in full all persons who have furnished material or
performed labor on the property.

(2) If any payment by the owner to the contractor,
architect or other person is not sufficient to pay in full
all bills for material and labor, then such claims shall
be paid on a pro rata basis to the amount of payments
received, unless otherwise agreed between the
contractor, architect or other person and the holder of
the claim for material or labor.

In *Blanton v. Commonwealth*, 562 S.W.2d 90 (Ky. App. 1978),

Blanton "entered into a contract to construct a residence[,]" was paid a sum of

money on the contract, and "failed to pay certain claims for labor and material used

in construction of the residence." *Id.* at 91. He was convicted of theft by failure to

make required disposition of property. On appeal, this Court held "Blanton clearly

had a legal obligation to pay in full all claims for material and labor furnished on

the . . . residence out of the sum . . . received on the contract from" the owner

under KRS 514.070. *Id.* at 92. "If the amount paid by the owner was not sufficient

to pay all such bills, then it was Blanton's duty to pay all bills for material and

labor on a pro rata basis" under KRS 376.070(2). *Id.* This statutory provision

protects the owner of the property. "Unless the contractor pays the claims for labor

and material, mechanics' liens may be asserted against the owner's property, and the owner may be required to pay twice for his home." *Id.*

This Court expounded on the two elements of theft by failure to make a required disposition of property. First, "[a]n example of property obtained 'subject to a known legal obligation' is a contractor or architect who fails to apply payments to claims of mechanic's or materialman's liens presently an offense under KRS 376.070." *Id.* Second, "a contractor must not only know that an amount is due and owing for labor and material, but he must also know that he has a legal obligation to make payment out of the proceeds received from the owner and must intentionally deal with proceeds as his own." *Id.* at 94.

Katherine's and Anthony's actions meet the elements of theft by failure to make required disposition of property over $10,000. First, they obtained funds from the Tans subject to a known legal obligation to pay subcontractors under KRS 376.070. Katherine argues the facts in *Blanton* differ because the money in that case was earmarked for labor and materials. Despite her argument that a contractor only owes a duty to pay subcontractors when funds are earmarked for specific use, that is not what the law requires. When Eric refused to give A-O-K additional funding for tile, Anthony sent a text message to Eric stating, "You gave us 26k. The plumber and electrician is [sic] taking half of that." R. at Commonwealth's Trial Exhibit 5. Katherine later informed Mosley, the

-14-

electrician, that he would not be paid until his insurer sent a waiver of liability and a certificate of insurance, but neither was requested when they hired Mosley. When the police got involved, Katherine and Anthony said they believed they were not required to pay the subcontractors until they received the $9,000 Phase II payment. Despite these later excuses, Anthony's text message proves he and Katherine knew they had to pay the electrician and plumber out of the $26,000 paid by the Tans for Phase I.

Additionally, Katherine and Anthony treated Eric's money as their own. Although both Katherine and Anthony testified they made business purchases from A-O-K's bank account, neither could identify any specific purchases related to the Cold Stone Creamery. Katherine acknowledged they made personal purchases from the account and characterized it as a commingling of personal and business expenses. Again, she could not point to any specific business purchases made from A-O-K's account. Thus, we conclude the trial court did not err in denying Katherine's motion for a directed verdict. The Commonwealth presented sufficient evidence for a jury to believe beyond a reasonable doubt that Katherine and Anthony were guilty of theft by failure to make required disposition of property over $10,000.

Second, Katherine argues the trial court did not have jurisdiction over the case because it involved a contract dispute. Throughout her brief, Katherine

makes several arguments that her conduct was not criminal and instead was a civil matter. First, she argues she cannot be held criminally liable because she provided "part performance" under the contract. Katherine's Appellant Brief at 12-15. She believes the value of her part performance exceeded the fair market value of what the Tans paid A-O-K. But the Commonwealth's evidence established that A-O-K received a total of $30,000 from the Tans, A-O-K failed to pay the subcontractors' invoices, and Katherine and Anthony treated more than $10,000 of the Tans's money as their own. Additionally, "part performance" is not a defense under KRS 514.070.

Katherine also argues the contract with the Tans was governed by the Kentucky Fairness in Construction Act ("KFCA"), KRS 371.400 *et seq*. The parties dispute whether this argument was preserved, but the argument is meritless. Under *Blanton*, criminal liability does not attach when there is a good-faith payment dispute. *Blanton*, 562 S.W.2d at 94. But the evidence does not show a good-faith payment dispute. Instead, the record shows Katherine and Anthony knew they had an obligation to pay the subcontractors out of the Phase I funds from Eric, failed to pay the subcontractors, and treated more than $10,000 of the funds as their own. Additionally, no provision in the KFCA voids or preempts any part of the penal code. The KFCA merely governs the conditions that must be present for construction contracts to be "void and unenforceable[.]" KRS 371.405.

-16-

Katherine further argues she could not be found guilty under KRS 514.070 because contractors "are not required to pay subcontractors for disputed or improperly completed work." Katherine's Appellant Brief at 18. The Commonwealth presented evidence to the contrary at trial. The jury weighed the conflicting evidence and found Katherine guilty. Thus, the trial court had jurisdiction over this case because the Commonwealth presented sufficient evidence to establish criminal liability under KRS 376.070.

Finally, Katherine argues the trial court denied her the right to cross-examine Graham, the plumber, who threatened to kill her husband and son. She asserts the trial court erred in excluding screenshots of text messages from Graham sent to Anthony weeks after Graham submitted his invoice, and Eric informed Katherine and Anthony that A-O-K was terminated from the project. Graham accused Anthony of being a thief and complained he was not paid from the $30,000 A-O-K received from the Tans. Anthony responded that he planned to pay Graham after the Tans paid $4,860 for the grease trap. Graham responded, "How about I shoot you with you [sic] own gun over 5k dollars?" Graham also asked if Anthony's son carried a gun. Katherine's Avowal Exhibit 1.

The trial court correctly found these messages were irrelevant and would confuse the issues to be decided by the jury. KRE[4] 402-403. The issue for

---

[4] Kentucky Rules of Evidence.

-17-

the jury to decide was whether Katherine and Anthony knowingly treated money from the Tans owed to the subcontractors as their own. The trial court correctly denied admission of the screenshots because they would have essentially put Graham on trial without being relevant to proving or disproving any element of KRS 514.070.

## 2. No. 2020-CA-0477-MR – Anthony's Appeal of His Conviction

On appeal, Anthony argues: (1) the trial court erred in denying his motion for directed verdict of acquittal and judgment notwithstanding the verdict; and (2) the jury instructions did not adequately state the law of theft by failure to make a required disposition.

First, Anthony argues the trial court erred in denying his motion for directed verdict of acquittal and judgment notwithstanding the verdict. He argues (a) the KFCA applies, making this a contract dispute, not a criminal case; (b) there was insufficient evidence to prove the elements of KRS 514.070 beyond a reasonable doubt, and (c) the Tans retained the funds and obligation to pay the subcontractors because they refused to pay for the grease trap and drain. His arguments require the same legal analysis as Katherine's. Based on our review of Katherine's arguments above, the Commonwealth presented sufficient evidence for the jury to find Anthony guilty of theft by failure to make a required disposition of property over $10,000. *Supra*, at 11-16.

Second, Anthony argues the jury instructions did not adequately state the law of theft by failure to make required disposition. Anthony argues the trial court failed to include a claim of right instruction under KRS 514.020(1)(b) and failed to include the essential language of "agreement" or "known legal obligation."

The following was the trial court's instruction on theft by failure to make required disposition of property over $10,000:

> A. That in Jefferson County, Kentucky between September 24, 2016 and October 10, 2016, THEODORE ANTHONY WALDRIDGE, either acting alone or in complicity with Katherine Marie Waldridge, received a sum of money from Eric Tan in payment for labor and materials to be furnished for the remodel of premises located at 976 Breckinridge Lane;
>
> AND
>
> B. That it was the obligation of THEODORE ANTHONY WALDRIDGE to pay a portion of the money to other persons who had provided labor and/or materials for the remodel of the premises at 976 Breckinridge Lane;
>
> AND
>
> C. That THEODORE ANTHONY WALDRIDGE knew he was obligated to pay a portion of the money to other persons who had provided or were to provide labor and/or materials for the remodel of the premises at 976 Breckinridge Lane;
>
> AND

D. That THEODORE ANTHONY WALDRIDGE failed to pay a portion of that money to those other persons who had provided or were to provide labor and/or materials for the remodel of the premises at 976 Breckinridge Lane;

AND

E. That THEODORE ANTHONY WALDRIDGE acted with the intention to deprive Eric Tan of that part of the money which Tan had paid;

AND

F. That in doing so the amount of money that THEODORE ANTHONY WALDRIDGE obtained from Eric Tan totaled $10,000 or more.

The Commonwealth points out this argument was not preserved because Anthony merely tendered proposed instructions and failed to contemporaneously object to the court's instructions. Under RCr[5] 9.54(2), "to preserve any error relating to the failure to give an instruction, there must be an objection in the record stating specifically the matter to which the party objects and the ground therefore. Merely tendering an alternative instruction is not sufficient." *Greene v. Commonwealth*, 244 S.W.3d 128, 137 (Ky. App. 2008) (citations omitted). But Anthony requests review for palpable error under RCr 10.26.

"Kentucky has long employed the use of 'bare bones' jury instructions, avoiding an abundance of detail and providing only a framework of

_____
[5] Kentucky Rules of Criminal Procedure.

the applicable legal principles." *Sutton v. Commonwealth*, 627 S.W.3d 836, 851 (Ky. 2021) (citations omitted). "If the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury." *United Parcel Service, Inc. v. Barber*, 557 S.W.3d 303, 310 (Ky. App. 2018) (quoting *Ballback's Adm'r v. Boland-Maloney Lumber Co.*, 306 Ky. 647, 652-53, 208 S.W.2d 940, 943 (1948)).

As to Anthony's argument about the trial court's omission of his claim of right defense, the trial court did not palpably err in excluding this language. In discussing a conviction for theft by unlawful taking, our Supreme Court stated, when the Commonwealth provides evidence proving elements of theft, "and no statutory defense under KRS 514.020 such as a claim of right to the property . . . creates at least a reasonable doubt in the mind of the jury, that person may be convicted of the crime of theft by unlawful taking." *Commonwealth v. Day*, 599 S.W.2d 166, 169 (Ky. 1980). Anthony presented a claim of right defense during trial, and the jury clearly found the Commonwealth proved Anthony's guilt beyond a reasonable doubt. The jury heard evidence from both parties and concluded Anthony committed the crime of theft by failure to make required disposition of property and also found him not guilty of theft by deception. The trial court's statement of the law was substantially correct, and Anthony does not allege that the instruction was calculated to mislead the jury.

As to Anthony's argument about the language of the instruction on theft by failure to make required disposition, it stated Anthony had an "obligation" to pay the subcontractors. Although the instruction does not contain the precise language of "agreement" or "known legal obligation" under KRS 514.070, it still provides a framework of the applicable legal principles. Anthony does not allege that the instructions were calculated to mislead the jury. The trial court's instructions were substantially correct, and no error rose to the level of "easily perceptible, plain, obvious and readily noticeable." *Martin v. Commonwealth*, 409 S.W.3d 340, 344 (Ky. 2013). Thus, we affirm Anthony's conviction of theft by failure to make required disposition of property.

### 3. Nos. 2020-CA-01592-MR and 2020-CA-1601-MR – Katherine's and Anthony's Appeals of the Restitution Order

On appeal, Katherine and Anthony argue the trial court violated their right to due process by: (1) awarding compensation in excess of the statutory scheme of restitution (and) denying them a reasonable opportunity to call witnesses and present evidence to counter the claim against them. Katherine also argues her right to due process was violated when the trial court denied an *ex parte* hearing to request funds to hire an expert to help prepare her defense.

On appeal, we review the trial court's decision to order restitution for abuse of discretion. *Bentley v. Commonwealth*, 497 S.W.3d 253, 255 (Ky. App. 2016). But because the trial court is the fact finder in setting the amount of

restitution, we will not set aside the amount of restitution unless it is clearly

erroneous and unsupported by substantial evidence. *Mitchell v. Commonwealth*,

538 S.W.3d 326, 329 (Ky. App. 2017). "Substantial evidence is evidence which,

when taken alone or in light of all the evidence, has sufficient probative value to

induce conviction in the mind of a reasonable person." *Id.*

First, Katherine and Anthony argue the trial court erred in ordering

restitution in an amount exceeding the Tans's loss. KRS 533.030(3) sets forth the

conditions under which a trial court must order restitution in pertinent part:

> [I]n a case where a victim of a crime has suffered
> monetary damage as a result of the crime due to his or
> her property having been converted, stolen, or unlawfully
> obtained, . . . direct out-of-pocket losses, or loss of
> earning as a direct result of the crime, . . . the court shall
> order the defendant to make restitution in addition to any
> other penalty provided for the commission of the offense.
> . . . Restitution shall be ordered in the full amount of the
> damages[.]

The definition of restitution includes "other expenses suffered by a victim because

of a criminal act[.]" KRS 532.350(1)(a).

At trial, the Commonwealth presented evidence that the Tans paid A-

O-K $4,000 for permits and planning and $26,000 for Phase I of the project;

Katherine and Anthony spent much of the funds for personal purchases, failed to

pay the plumber and electrician, and failed to complete Phase I. Based on this

evidence, the jury convicted Katherine and Anthony of theft by failure to make

required disposition, finding they had a known legal duty to pay the plumber and electrician and failed to do so. The jury also acquitted them of theft by deception, finding they did not obtain money from the Tans with the intent to deprive them of their money and not perform the remodel.

During the August 6, 2020 restitution hearing, Eric testified he had to pay $4,000 to Graham the plumber, $4,000 to Mosley the electrician, and $5,000 to Burnett for demolition. Eric testified that he paid Mosley and Graham each $4,000 for the work they performed while A-O-K worked on the remodel. He testified the $5,000 payment to Burnett was for demolition work performed after A-O-K left the job. Mosley testified he asked for payment of his $6,000 invoice for rough-in and demolition before A-O-K left the job. Katherine and Anthony never paid him, but Eric ended up paying him $4,000 for that work. Mosley stated Katherine and Anthony never paid the remaining balance. Graham did not testify at the hearing.

Katherine and Anthony dispute the entire restitution amount and argue why Eric's payments to Graham, Mosley, and Burnett do not meet the requirements of KRS 533.030(3). As to Burnett, they argue they are not liable for the $5,000 Eric paid Burnett to finish the demolition work because Eric did not make this payment as a direct result of the theft by failure to make a required disposition. The Commonwealth does not address this argument. The jury convicted Katherine and Anthony of theft by failure to make required disposition

-24-

based on evidence that they had a known obligation to use the funds from the Tans to pay the subcontractors. But the jury acquitted Katherine and Anthony of theft by deception finding they did not intentionally fail to perform the remodel and did not intend to deprive Tan of his money.

In *Dale v. Commonwealth*, 604 S.W.3d 281 (Ky. App. 2019), this Court addressed "what types of losses arise 'as a direct result of the crime'" under 533.030(3) and turned to federal case law for examples:

> In *In re Bex*, 143 B.R. 835 (Bankr. E.D. Ky. 1992), a minor was involved in a motor vehicle accident while operating a vehicle owned by his parents. *Id.* at 836. Because the driver was a minor, his parents were "financially responsible for any damages [he] caused as a result of his driving" pursuant to KRS 186.590. *Id.* The minor's father "pled guilty to failure to maintain insurance required by KRS 304.39-080(5) which requires owners of motor vehicles operated in Kentucky to maintain certain levels of liability insurance. KRS 304.99-060 provides criminal penalties for failure to maintain such required insurance." *Id.* The issue before the bankruptcy court was whether the combination of the two statutes rendered the parents "liable for the tort of their son." *Id.* For the parents to be financially responsible, their conduct must have been both willful and malicious. *Id.* The court found that there was "no allegation that the parents intended that the child should have an automobile wreck or, alternatively, that they deliberately allowed the required insurance to lapse with the knowledge or belief that [the child] would be involved in a collision." *Id.* Thus, the court held that the debtors were not liable for the injuries the plaintiffs sustained in the motor vehicle accident merely because the debtors failed to maintain insurance. *Id.* at 836-37.

> Although factually dissimilar, *United States v. Burger*, 739 F.2d 805 (2d Cir. 1984), provides an in-depth discussion of when criminal conduct does not directly cause a victim monetary loss. In *Burger*, the defendant purchased counterfeit bills and took them to Yonker's Raceway. *Id.* at 807. The opinion indicates the defendant did not spend any of the money at the raceway. *Id.* at 811. The defendant "was convicted of possessing and concealing counterfeit money." *Id.* The trial court ordered the defendant to pay restitution to the victim "as a condition of probation." *Id.* The Second Circuit opined: "It is difficult to see how the possession and concealment of the bogus bills caused the loss incurred by [the business]. The statute provides for the reparation of losses suffered by the victim of a criminal act." *Id.* And, it held the "offense did not 'cause' the loss for which he now is required to make restitution[.]" Had the defendant spent the counterfeit money, it would have been the passing of the counterfeit bills that harmed the business, not "the mere possession and concealment of the bogus money[.]" *Id.*

*Id.* at 288.

It is clear the financial loss the Tans incurred in paying Burnett $5,000 to complete the demolition work was not directly caused by the crime of theft by failure to make required disposition. The jury acquitted Katherine and Anthony of theft by deception, so the Commonwealth failed to prove they intentionally failed to perform the remodel and they intended to deprive the Tans of their money. As in *Dale*, Katherine and Anthony were not convicted of "any crime in connection with the nature of restitution sought" for Burnett's demolition work, so the trial court improperly imposed $5,000 in restitution for Eric's payment to Burnett. The

-26-

Commonwealth sought financial recovery for theft by deception, of which the jury acquitted Katherine and Anthony. Thus, the trial court's award of $5,000 for Burnett's demolition work was clearly erroneous.

As to Mosley and Graham, Katherine argues the Commonwealth failed to prove the entire two $4,000 payments were for work performed under A-O-K. They claim some portion of the payments to Graham and Mosley was for work performed after A-O-K left the job. The Commonwealth bore the burden of proving "the validity of the claim for restitution and the amount of restitution by a preponderance of the evidence." *Jones v. Commonwealth*, 382 S.W.3d 22, 32 (Ky. 2011). Eric testified the $4,000 payments to Graham and Mosley were for work performed while A-O-K worked on the project, so Katherine and Anthony were supposed to pay those subcontractors out of the $26,000 Phase I payment. Mosley testified to the same effect. Katherine and Anthony tried to elicit testimony to the contrary and argue some of the $8,000 total paid to Graham and Mosley was for work performed after they left the project. But they presented no evidence to the contrary. Thus, the Commonwealth established the amount of restitution by a preponderance of the evidence, and the amount of $8,000 for the payments to Graham and Mosley are supported by substantial evidence.

Second, Katherine and Anthony argue the trial court denied their right to due process in denying them a reasonable opportunity to call witnesses and

present evidence to counter the claim against them. One of the due process protections afforded to defendants in due process hearings is "a reasonable opportunity for the defendant with assistance of counsel to present evidence or other information to rebut the claim of restitution and the amount thereof." *Id.* The trial court set the restitution hearing for forty-five minutes. Despite knowing the hearing was only scheduled for forty-five minutes and, after being warned repeatedly of the time constraint, defense counsel continued to question Eric and Mosley for well beyond forty-five minutes. When counsel tried to call Robert Hammers, an investigator for the Louisville-Metro Public Defender's office, the trial court denied her request.

If the trial court erred in denying Katherine and Anthony the opportunity to call Hammers as a witness, this amounts to harmless error and is a moot issue. Hammers's affidavit was attached to Katherine and Anthony's motion to alter, amend, or vacate, so the trial court still considered their rebuttal evidence in denying that motion. Additionally, Hammers's affidavit solely concerns the $5,000 paid to Burnett. As we held that payment not directly related to the crime of theft by failure to make required disposition, the Tans are not entitled to restitution for that amount.

Finally, Katherine argues the trial court denied her right to due process in denying an *ex parte* hearing to request funds to hire a forensic

accountant to assist in the preparation for the restitution hearing. No Kentucky case has addressed whether a defendant is entitled to expert funding for a restitution hearing. But the facts do not support a general holding as to whether expert funding is appropriate for restitution hearing.

"This Court reviews a trial court's denial of a defendant's motion for expert funds for abuse of discretion." *Daniel v. Commonwealth*, 607 S.W.3d 626, 634 (Ky. 2020) (citing *McKinney v. Commonwealth*, 60 S.W.3d 499, 505 (Ky. 2001)).

KRS 31.110(1) entitles needy persons to representation and services during criminal proceedings, "including investigation and other preparation." KRS 31.185 governs hiring private experts:

> (1) Any defending attorney operating under the provisions of this chapter is entitled to use the same state facilities for the evaluation of evidence as are available to the attorney representing the Commonwealth. If he or she considers their use impractical, the court of competent jurisdiction in which the case is pending may authorize the use of private facilities to be paid for on court order from the special account of the Finance and Administration Cabinet.

> (2) The defending attorney may request to be heard ex parte and on the record with regard to using private facilities under subsection (1) of this section. If the defending attorney so requests, the court shall conduct the hearing ex parte and on the record.

"[T]he test for whether a defendant made a sufficient showing of need for expert funds [is]: 1) whether the request has been pleaded with requisite specificity; and 2) whether funding for the particularized assistance is reasonably necessary; 3) while weighing relevant due process considerations." *Daniel*, 607 S.W.3d at 635 (internal quotation marks omitted) (quoting *Benjamin v. Commonwealth*, 266 S.W.3d 775, 789 (Ky. 2008)). Additionally, "our review of a trial court's denial of funds pursuant to KRS 31.110 is limited to the reasons actually presented to the trial court." *Id.* (quoting *McKinney*, 60 S.W.3d at 505).

Even if KRS 31.185 applies to restitution hearings, we do not know what reasons Katherine presented to the trial court. On July 31, 2020, Katherine filed a motion requesting an *ex parte* hearing to show the necessity for and appropriateness of funds for a forensic accountant. The motion was noticed for the trial court's August 3 motion hour. If Katherine filed an *ex parte* motion or memorandum in support of her request, it is not a part of the record on appeal. She did not attach a copy of any supporting memorandum to her brief nor did she cite it. Thus, we cannot discern what specific arguments she presented to the trial court in support of her motion. It is unclear from the record whether the trial court heard the motion at its August 3 motion hour, but there is an order filed under seal on July 30, 2020, which appears to be a tendered order, where the trial court wrote in

-30-

the margin "Denied. [The Court determined that] only $1,250 [was in] dispute per CW's request."[6] Katherine's Appellate Brief, Exhibit D.

Although Katherine cites applicable case law, she presents a confusing argument that the total amounts on Graham and Mosley's invoices were for commingled services performed during and after A-O-K's work on the project. But Katherine cites to nothing in the record showing her request for funding was anything more than a fishing expedition. *Kordenbrock v. Commonwealth*, 700 S.W.2d 384, 387 (Ky. 1985). This conclusion is also supported by the fact that Katherine never requested this funding during discovery before trial. Instead, she requested it less than a week before the restitution hearing. The statute requires the trial court to hold an *ex parte* hearing if requested. But, given the above analysis, the trial court's failure to hold an *ex parte* hearing is harmless error.

For all these reasons, we affirm Jefferson Circuit Court's judgments of conviction against Anthony and Katherine. As to the order of restitution, we affirm in part and vacate in part.

ALL CONCUR.

---

[6] We cannot discern from the record why the date of the order denying the motion for expert funding was filed and entered on July 30, 2020, when the motion was dated July 31, 2020, and noticed for the trial court's August 3, 2020, motion hour.

-31-

BRIEFS FOR APPELLANT
KATHERINE M. WALDRIDGE:

Christopher B. Thurman
Louisville, Kentucky

BRIEFS FOR APPELLANT
THEODORE ANTHONY
WALDRIDGE:

Yvette DeLaGuardia
Louisville, Kentucky

BRIEFS FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Robert Baldridge
Assistant Attorney General
Frankfort, Kentucky